## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| FLOWERS TITLE COMPANIES LLC, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | 6:25-cv-00127-JDK |
| SCOTT BESSENT, in his official capacity | § | |
| as U.S. Secretary of Treasury; U.S. | § | |
| DEPARTMENT OF TREASURY; and THE | § | **ORAL ARGUMENT** |
| FINANCIAL CRIMES ENFORCEMENT | § | **REQUESTED** |
| NETWORK, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

MOTION FOR SUMMARY JUDGMENT ..................................................... 1

INTRODUCTION ....................................................................................... 1

STATEMENT OF ISSUES ......................................................................... 2

BACKGROUND AND STATEMENT OF FACTS ......................................... 2

   I.   FinCEN's Sub-Delegated Statutory Authority ................................ 2

   II.   FinCEN's Real Estate Reporting Rule ........................................... 5

      A.  The Rule Requires Reporting of Sensitive Information ............ 5

      B.  Regulatory Burden on East Texas Title ................................... 6

STANDARD OF REVIEW ......................................................................... 7

SUMMARY OF ARGUMENT .................................................................... 7

ARGUMENT ............................................................................................ 9

   I.   FinCEN Lacks Statutory Authority ................................................. 9

   II.   FinCEN's Interpretation Violates the Nondelegation Doctrine..................... 12

      A.  No Policy Speaking to When Business Should Report Lawful Transactions........................................................................ 13

      B.  No Limit on the Secretary's Authority to Decide What Will (Or Will Not) Be Regulated ........................................... 19

   III.   The BSA and the Final Rule Exceed Congress's Enumerated Powers........... 20

   IV.   The Final Rule Violates the Fourth Amendment ........................... 28

CONCLUSION....................................................................................... 30

CERTIFICATE OF SERVICE................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airbnb, Inc. v. City of New York,*
373 F. Supp. 3d 467 (S.D.N.Y. 2019) ................................................................... 29

*ALA Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ............................................................................................. 14

*Biden v. Nebraska,*
600 U.S. 477 (2023) ............................................................................................. 11

*Big Time Vapes, Inc. v. Food & Drug Admin.,*
963 F.3d 436 (5th Cir. 2020) ........................................................... 13–14, 17, 19

*California Bankers Ass'n v. Shultz,*
416 U.S. 21 (1974) ........................................................................................ 23–24, 30

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) ............................................................................................. 29

*Consumers' Rsch. v. FCC,*
Nos. 24–354, 24–422, 2025 WL 1773630 (U.S. June 27, 2025) ............... 12–14, 18

*Duncan v. Walker,*
533 U.S. 167 (2001) ............................................................................................. 11

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985) ............................................................................................... 7

*GDF Realty Invs., Ltd. v. Norton,*
326 F.3d 622 (5th Cir. 2003) ............................................................................... 25

*Gonzales v. Raich,*
545 U.S. 1 (2005) ................................................................................................. 23

*Hale v. Henkel,*
201 U.S. 43 (1906) ............................................................................................... 29

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
448 U.S. 607 (1980) ............................................................................................. 17

*INS v. Chadha,*
462 U.S. 919 (1983) ............................................................................................. 13

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) .................................................................. 13

*Katz v. United States,*
    389 U.S. 347 (1967) .......................................................................... 29

*Kyllo v. United States,*
    533 U.S. 27 (2001) ........................................................................... 30

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ........................................................................... 9

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ........................................................................... 9

*Mayfield v. Dep't of Lab.,*
    117 F.4th 611 (5th Cir. 2024) ........................................................... 9, 17

*McCulloch v. Maryland,*
    17 U.S. 316 (1819) .......................................................................... 23

*Mistretta v. United States,*
    488 U.S. 361 (1989) ......................................................................... 13

*Nat'l League of Cities v. Usery,*
    426 U.S. 833 (1976) ......................................................................... 28

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ......................................................................... 20

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ..................................................................... 21–23

*Panama Refining Co. v. Ryan,*
    293 U.S. 388 (1935) ..................................................................... 14, 16

*Patel v. City of Los Angeles,*
    738 F.3d 1058 (9th Cir. 2013) ......................................................... 29–30

*Riley v. California,*
    573 U.S. 373 (2014) ......................................................................... 30

*Smith v. U.S. Dep't of Treasury,*
    761 F. Supp. 3d 952 (E.D. Tex. 2025) ....................................... 22, 24, 26

*Terkel v. Ctrs. for Disease Control & Prevention,*
    15 F.4th 683 (5th Cir. 2021) ............................................................. 25

*Terkel v. Ctrs. for Disease Control & Prevention,*
    521 F. Supp. 3d 662 (E.D. Tex. 2021) ...................................................... 25, 27–28

*Texas Top Cop Shop, Inc. v. Garland,*
    758 F. Supp. 3d 607 (E.D. Tex. 2024) ...................................................... 22, 24–25

*Texas Top Cop Shop v. Bondi,*
    No. 24-40792 (5th Cir.) ........................................................................... 24

*Tyler v. Hennepin Cnty.,*
    598 U.S. 631 (2023) .................................................................................. 7

*United States v. Bailey,*
    115 F.3d 1222 (5th Cir. 1997) ................................................................. 21

*United States v. Chavarria,*
    140 F.4th 1257 (10th Cir. 2025) .............................................................. 22

*United States v. Jones,*
    565 U.S. 400 (2012) .................................................................................. 28

*United States v. Lopez,*
    514 U.S. 549 (1995) .................................................................... 21, 27–28

*United States v. Morrison,*
    529 U.S. 598 (2000) ..................................................................... 23, 25–28

*United States v. Robel,*
    389 U.S. 258 (1967) .................................................................................. 18

*United States v. Smith,*
    110 F.4th 817 (5th Cir. 2024) ........................................................... 29–30

*Util. Air Reg. Grp. v. EPA,*
    573 U.S. 302 (2014) .................................................................................. 11

*W. Virginia v. Env't Prot. Agency,*
    597 U.S. 697 (2022) .................................................................................. 11

*Wayman v. Southard,*
    23 U.S. (10 Wheat 1) 1 (1825) ................................................................ 13

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .................................................................... 12–13, 18

## U.S. Constitution

U.S. Const. amend. IV ........................................1–2, 9, 12–13, 18, 22, 28–30

U.S. Const. amend. X .................................................................. 21

U.S. Const. art. 1, § 1 .............................................................. 12, 20

U.S. Const. art. 1, § 8 .................................... 1, 9, 12, 22, 25, 27

U.S. Const. art. 1, § 8, cl. 3 ............................................................ 21

## Statutes

5 U.S.C. § 706 .................................................................... 7

5 U.S.C. § 706(2)(A) ............................................................ 7

5 U.S.C. § 706(2)(B) ............................................................ 7

5 U.S.C. § 706(2)(C) ............................................................ 7

18 U.S.C. § 1956 ............................................................ 25–26

28 U.S.C. § 2201 .................................................................. 7

31 U.S.C. § 5311 ..................1–3, 9, 12, 15–17, 19–21, 23, 25–27

31 U.S.C. § 5311(1)(A) ............................................................ 3

31 U.S.C. § 5312(a)(2)(U) ................................................... 4, 19

31 U.S.C. § 5312(a)(2)(Y) ......................................................... 19

31 U.S.C. § 5312(a)(2)(Z) .................................... 4, 11, 18–20

31 U.S.C. § 5318 ........................................ 12, 15, 20, 24, 26

31 U.S.C. § 5318(a)(2) .............................. 3, 8, 10–11, 16, 24, 26

31 U.S.C. § 5318(a)(7) ....................................................... 4, 20

31 U.S.C. § 5318(g) ................................... 2–3, 7–11, 20, 25

31 U.S.C. § 5318(g)(1) ............................... 3, 8–9, 15, 24, 30

31 U.S.C. § 5318(h) .............................................................. 20

31 U.S.C. § 5318(h)(1) ................................................................................ 4

31 U.S.C. § 5318(h)(1)(A)–(D) ................................................................... 4

31 U.S.C. § 5318(h)(2) ................................................................................ 4

31 U.S.C. § 5318(h)(2)(A) ........................................................................... 4

31 U.S.C. § 5318(n) ................................................................................... 10

31 U.S.C. § 5335 ................................................................................... 25–26

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690,
    102 Stat. 4181 (1988) .......................................................................... 27

Act of Oct. 26, 1970, Pub. L. No. 91-508, 84 Stat. 1114 (1970) ................. 26

Tex. Prop. Code § 12.019(d) ........................................................................ 6

## Regulations

31 C.F.R. § 1031.320(b)(2) ........................................................................... 5

31 C.F.R. § 1031.320(c)(1) ........................................................................... 6

Agency Information Collection Activities; Submission for OMB Review;
    Comment Request; Real Estate Reports, 90 Fed. Reg. 23991
    (June 5, 2025) ................................................................................. 6, 30

Anti-Money Laundering Regulations for Residential Real Estate
    Transfers, 89 Fed. Reg. 12424 (Feb. 16, 2024). ................................. 4, 16

Anti-Money Laundering Regulations for Residential Real Estate
    Transfers, 89 Fed. Reg. 70258 (Aug. 29, 2024) ......1–3, 5–10, 16, 20–22, 24, 28–30

Treasury Order 180–01 (Jan. 14, 2020) ........................................................ 3

## Rules

Fed. R. Civ. P. 56 ......................................................................................... 1

Fed. R. Civ. P. 56(a) ..................................................................................... 7

Local R. CV-56 .............................................................................................. 1

## Other Authorities

A.B.A., *The Federalization of Criminal Law,*
11 Fed. Sent'g Rep. 194 (Jan./Feb. 1999) .............................................................. 15

*A Freeman II*, Pa. Gazette (Jan. 30, 1788),
*in* 15 Documentary History...................................................................................... 28

Elliot, Jonathan, 3 *The Debates in the Several State Conventions on the
Adoption of the Federal Constitution* (2d ed. 1836)............................................... 28

Natelson, Robert G., *The Founders Interpret the Constitution: The
Division of Federal and State Powers,*
19 Federalist Soc'y Rev. 60 (2018) ......................................................................... 28

*Suspicion*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/suspicion (last visited July 15, 2025) ............................. 15

*Suspicious,* Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/suspicious (last visited July 15, 2025)............................. 15

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule CV-56, Plaintiff Flowers Title Companies LLC, moves for summary judgment as to all its claims.

## INTRODUCTION

The Flowers Title Companies LLC (hereafter, "East Texas Title" or "ETT") provides a critical service in the Texas real estate market. The company facilitates real estate closings, which are generally regulated only under state law. But the federal Financial Crimes Enforcement Network ("FinCEN") will soon require East Texas Title to file "Real Estate Report[s]" providing the United States with many details about commonplace residential transactions, such as the beneficial ownership information for certain trusts and incorporated entities involved. Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 70258 (Aug. 29, 2024) ("Final Rule" or "Rule"). This Rule will require ETT to gather and report information that the company "would not need to collect (much less report) to facilitate a closing under state law." *See* Exhibit A, Suppl. Decl. of Celia Flowers ¶ 30 ("Flowers Decl."). And it will compel ETT to gather information from its clients that many would prefer to keep private, such as identifying information for a child beneficiary of a trust, or other substantive details about a trust.[1]

But Congress never authorized the Rule.[2] FinCEN claims authority under the Bank Secrecy Act ("BSA"). But while the Act enables the agency to compel reporting

---

[1] The mandate to collect and report this private information violates the Fourth Amendment, which protects against warrantless searches. *See infra* at 28–30.

[2] Nor could Congress under the Commerce Clause. *See infra* at 20–28.

of specific transactions that may be "highly useful" to law enforcement, 31 U.S.C. § 5311, it requires an individualized reason for "suspicio[n]." 31 U.S.C. § 5318(g). As such, FinCEN is reaching beyond its authority in mandating reports for an entire class of transactions without any specific basis for suspicion.

Moreover, FinCEN's authority cannot be stretched to allow for such sweeping reporting requirements without violating the separation of powers. If FinCEN can compel reporting for an entire class of transactions without need of individualized suspicion, then there is no limit to what transactions FinCEN could require reporting on. Under that extravagant interpretation, the BSA delegates a boundless authority enabling the agency to mandate reports affecting all American commerce. So construed, the BSA violates the constitutional precept—enforced in the nondelegation doctrine—that Congress cannot delegate its lawmaking powers.

## STATEMENT OF ISSUES

(1)    Whether the Bank Secrecy Act authorizes the Final Rule, and, if so, whether the Act unconstitutionally delegates Congress' exclusive power to make law?

(2)    Whether Congress exceeded its power to regulate interstate commerce in authorizing reporting requirements on residential real estate transfers?

(3)    Whether the Final Rule violates the Fourth Amendment?

## BACKGROUND AND STATEMENT OF FACTS

### I.    FinCEN's Sub-Delegated Statutory Authority

The Bank Secrecy Act was originally enacted, in 1970, to require the banking industry to maintain records and to report international transfers of assets to assist federal law enforcement in identifying criminal activity. But the "BSA" has been

2

amended numerous times to expand its regulatory reach; it now covers many different types of businesses (deemed "financial institutions"), as well as any other business that the Secretary of Treasury deems subject to BSA regulation.[3]

At issue in this case is a section of the BSA that authorizes the Secretary to require any "financial institution" to file suspicious activity reports and to abide by "procedures" as he may prescribe. The Secretary has subdelegated these powers to FinCEN.[4]

**1. Asserted Authority for Reporting Rules.** As authority for the Final Rule, FinCEN primarily relies on 31 U.S.C. § 5318(g)—which authorizes the Secretary (if he chooses) to promulgate regulation requiring "any financial institution[] to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). *See* Final Rule, 89 Fed. Reg. at 70258–59. In the alternative, FinCEN invokes 31 U.S.C. § 5318(a)(2), which authorizes the Secretary to promulgate rules requiring financial institutions to "maintain appropriate procedures, including the collection and reporting of certain information as the Secretary may prescribe by regulation … to guard against money laundering, the financing of terrorism, or other forms of illicit finance." *Id.*

**2. Open-Ended Definition of "Financial Institution."** The BSA enumerates twenty-six types of entities as "financial institutions" subject to the

---

[3] The purpose is to identify information that is "highly useful" to law enforcement in "criminal, tax, or regulatory investigations" and "to protect against terrorism." 31 U.S.C. § 5311(1)(A).
[4] *See* Treasury Order 180-01, ¶ 3(a) (Jan. 14, 2020).

Secretary's rulemaking authority—such as credit unions, currency exchange businesses, and "persons involved in real estate closings and settlements." 31 U.S.C. § 5312(a)(2)(U). But Congress did not limit the Secretary to regulating these institutions. Instead, Congress authorized the Secretary to deem "any other business" a "financial institution" if he believes its "cash transactions have a high degree of usefulness in criminal, tax, or other regulatory matters." *Id.* § 5312(a)(2)(Z).

### 3. AML/CFT Requirements and the Secretary's Exempting Authority.

By statute every "financial institution" is required to "establish [an] anti-money laundering and countering the financing of terrorism program[] …." *Id.* § 5318(h)(1). Congress specified that an "AML/CFT program" must have (1) "internal policies, procedures, and controls;" (2) a designated "compliance officer;" (3) "an ongoing employee training program;" and (4) "an independent audit function to test programs." *Id.* § 5318(h)(1)(A)–(D). But Congress did not specify any substantive program requirements. Instead, Congress delegated authority to the Secretary to "prescribe minimum standards." *Id.* § 5318(h)(2)(A). At the same time, Congress delegated authority for the Secretary to exempt any financial institution from these statutory requirements whenever he deems an exemption "appropriate."[5] *Id.* § 5318(a)(7); *see also* § 5318(h)(2).

---

[5] Since 2002, FinCEN has exempted "persons involved in real estate closings" from the statute's AML/CFT requirements. Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 12424 (Feb. 16, 2024) ("Proposed Rule"). *See also* Final Rule, 89 Fed. Reg. at 70276 (maintaining this exemption).

## II.    FinCEN's Real Estate Reporting Rule

FinCEN recently finalized a rule that requires "persons involved in real estate closings and settlements" to report on the details pertaining to any non-financed residential real estate transaction in the United States when ownership is transferred to an incorporated entity or a trust—unless an exemption applies.[6] Final Rule, 89 Fed. Reg. at 70290, 70293 (explaining that real estate reports must be filed "electronically with FinCEN"). The Rule contemplates that systematic reporting will aid law enforcement when investigating "possible violation[s of] law or regulation." *Id*. at 70259. Whether that is true or not, the Rule will compel reporting of private information about many law-abiding individuals.

### A.    The Rule Requires Reporting of Sensitive Information

Under the Final Rule, East Texas Title is required to report information beyond anything ETT is required to gather (much less report) for the purpose of facilitating a closing under Texas law. Flowers Decl. ¶ 30. For one, the Rule requires reporting on the beneficial ownership interests for any trust or incorporated entity involved in a reportable transaction;[7] however, Texas law does not require reporting on beneficial ownership interests in non-financed real estate transactions. Among other details, ETT must provide identifying information for "minor children" when they are the beneficiary of a trust. Final Rule, 89 Fed. Reg. at 70274.

---

[6] The Rule provides for only eight narrow exemptions—such as for transfers "incident to divorce." Final Rule, 89 Fed. Reg. at 70290 (codifying 31 C.F.R. § 1031.320(b)(2)).
[7] The Rule exempts certain transfers, like those "resulting from the death of an individual … by contractual provision[,]" or to a trust for which "no consideration [is] made by an individual" who is designated as the "settler[] or grantor[]." Final Rule, 89 Fed. Reg. at 70290.

And FinCEN's Rule compels reporting of other categories of information that ETT would not ordinarily collect. For example, when a trust is involved, ETT must report whether the trust is revocable. *Agency Information Collection Activities; Submission for OMB Review; Comment Request; Real Estate Reports*, 90 Fed. Reg. 23991, 23998 (June 5, 2025); Flowers Decl. ¶ 30. Likewise, when an individual signs on behalf of an incorporated entity, the Rule requires ETT to report information about the individuals' "employer, principal, or partnership[.]"[8] 90 Fed. Reg. at 23999; Flowers Decl. ¶ 30. And the Rule requires ETT to report information like whether a relative extended credit to the buyer, even though ETT has no obligation, under Texas law, to report such information when closing on a non-financed transfer. 90 Fed. Reg. at 24000; Flowers Decl. ¶ 30.

### B.   Regulatory Burden on East Texas Title

East Texas Title commonly facilitates non-financed residential transfers that will require real estate reports under the Final Rule. Flowers Decl. ¶ 22 (explaining ETT employees are often listed as the closing agent).[9] For each reportable transaction, its employees will have to spend time gathering all categories of required information, even if such inquiries seem cumbersome or invasive to its clients. *Id.* ¶¶ 21, 29. By FinCEN's conservative estimates, it will take "an average" of two hours to collect and review information for *each* reportable transaction, and an "average [of]

---

[8] Texas law requires ETT merely to confirm that the person signing has authority to do so. Tex. Prop. Code § 12.019(d).

[9] The Rule assigns primary responsibility for filing real estate reports with "the person listed as the closing or settlement agent … for the transfer[.]" *Id.* (codifying 31 C.F.R. § 1031.320(c)(1)).

30 minute[s]" of additional time in filing reports. Final Rule, 89 Fed. Reg. at 70286. In the aggregate, these requirements will impose severe burdens because ETT "facilitates or provides information for thousands of real estate closings" each year. *See* Flowers Decl. ¶¶ 7, 29 (explaining ETT must compensate its employees on an hourly basis for the time spent gathering and reporting information to FinCEN).[10]

## STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[11] Under the APA, a court must hold unlawful, set aside, and vacate agency action if it is not in accordance with law, 5 U.S.C. § 706(2)(A); or contrary to any constitutional right, power, privilege or immunity, *id.* § 706(2)(B); or in excess of statutory authority, *id.* § 706(2)(C). Here East Texas Title must show that the Agencies' claimed statutory authority violates the Constitution, or that the Final Rule is otherwise unlawful. East Texas Title is entitled to declaratory relief to clarify its rights to the extent there is a justiciable controversy. 28 U.S.C. § 2201.

## SUMMARY OF ARGUMENT

Without any statutory authority, the Final Rule compels East Texas Title to file reports about perfectly lawful transactions, affecting the privacy rights of many law-abiding individuals. FinCEN claims that it has authority under Section 5318(g)

---

[10] There should be no question that ETT has standing based on this "classic pocket-book injury." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023).

[11] There is no dispute as to any material fact here. *See generally* 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

of the BSA, which authorizes rules mandating reports of "any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). But the text of the statute only authorizes FinCEN to mandate reporting when there is reason to suspect impropriety as to a specific transaction. It does not authorize FinCEN to declare an entire class of lawful transactions as suspicious.

FinCEN interprets Section 5318(g) as authorizing the agency to deem an entire class of transactions subject to mandatory reporting if there is any basis to believe that, in the aggregate, systematic reporting might yield information "relevant to a possible violation of law or regulation." *See* Final Rule, 89 Fed. Reg. at 70259–62. Additionally, FinCEN claims that a separate provision authorizes "reporting" rules for any type of transaction that the agency may choose to "prescribe by regulation, to … guard against money laundering, the financing of terrorism, or other forms of illicit finance." *Id.* at 70259 n.11 (citing 31 U.S.C. § 5318(a)(2)). But FinCEN's extravagant interpretation is untenable. Both the plain language and the canons of construction make clear that Congress did not intend to give open-ended rulemaking authority.

Further, FinCEN's interpretation is impermissible under the nondelegation doctrine, which holds that Congress must decide the important policy matters and provide boundaries to limit rulemaking discretion. FinCEN rejects the notion that its authority is limited to mandating reporting on specific transactions for which there is an individualized basis for suspecting impropriety. But, once that limitation is read out of the statute, the only thing governing agency discretion is the FinCEN Director's

legislative judgment that the benefits of reporting outweigh competing public values. After all, systematic reporting of any kind of consumer transaction may be deemed relevant to unearthing "possible violation[s] of law or regulation," 31 U.S.C. § 5318(g)(1), in an age where all economic activity is regulated to varying degrees. As such, under FinCEN's interpretation, the BSA's sweeping delegation would far exceed any delegation that has previously withstood constitutional scrutiny.

Finally, if FinCEN has the authority it claims, the Rule presents other constitutional problems. The Rule violates the Commerce Clause to the extent it requires reporting on purely intrastate real estate transactions. And it violates the Fourth Amendment because it effects a warrantless search of business records and personal papers for both buyers and sellers in commonplace real estate deals, for which there is no individualized basis for suspecting any wrongdoing.

## ARGUMENT

### I. FinCEN Lacks Statutory Authority

"[A]n agency literally has no power to act … unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). As such, FinCEN must demonstrate that Congress has authorized the Final Rule. But FinCEN is not entitled to any deference when asserting authority under the Bank Secrecy Act. Rather, this Court must use "'all relevant interpretive tools' to determine the 'best' reading of the statute." *Mayfield v. Dep't of Lab.*, 117 F. 4th 611, 617 (5th Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)).

Here, the best reading of the BSA forecloses FinCEN's claimed authority. FinCEN principally relies on Section 5318(g), which authorizes the Secretary to

"require any financial institution … to report any suspicious transaction relevant to a possible violation of law or regulation." But this provision only contemplates reporting when there are signs of impropriety as to a ***specific*** "transaction." Had Congress intended systematic reporting of an entire class of transaction**s** (as FinCEN claims), it would not have used the singular term ("transaction"). *Compare with* 31 U.S.C. § 5318(n) (authorizing reporting of "cross-border transmittals"). Further, Section 5318(g) must be construed as requiring individualized assessments of each "transaction" because an act can only be deemed "suspicious" in the context of specific facts that give rise to a basis for suspicion.

FinCEN exceeded its statutory authority because the Rule sweeps-in many transactions for which there is no individualized reason for suspicion. After all, there are many legitimate reasons why individuals may prefer to buy without taking out a loan. *See* Flowers Decl. ¶¶ 11–17 (explaining that a buyer can save thousands of dollars if they can purchase without financing). For that matter, FinCEN admits that only a fraction of cash transactions have raised any kind of yellow flag in the past.[12]

Nor does Section 5318(a)(2) independently give FinCEN the authority it claims. That provision authorizes the Secretary to "require … businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of Treasury may prescribe by regulation … to guard against money

---

[12] FinCEN previously issued "geographic targeting orders" that required disclosures of non-financed residential transactions over specified dollar amounts in select geographic markets. *See* Final Rule, 89 Fed. Reg. at 70258–60 (discussing the "Benefits of Reporting").

laundering, the financing of terrorism, or other forms of illicit finance[.]" But this only authorizes rules specifying the ***procedures*** that financial institutions must abide by when reporting information as mandated by rules separately authorized under that subchapter, such as subsection (g). After all, it would have been unnecessary for Congress to specifically authorize reporting rules for "suspicious transactions" under subsection (g) if Congress had given a more general authority to compel systematic reporting under Section 5318(a)(2). *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (statutes should be construed to avoid rendering terms superfluous).

Moreover, there are compelling reasons for judicial skepticism because FinCEN is asserting an extraordinary authority to mandate reporting on any conceivable consumer transaction.[13] *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724 (2022) ("[W]e 'typically greet' assertions of 'extravagant statutory power over the national economy' with 'skepticism.'") (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). One would expect that Congress would provide a "clear statement" of authority if it truly intended to authorize systematic reporting of any class of consumer transaction. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (a clear statement is required to authorize regulation on matters of "deep 'economic or political' significance.").

---

[13] Recall, the Secretary is not limited to regulating the types of businesses that Congress deemed "financial institutions." The Secretary retains discretion to deem "any business" a "financial institution" subject to its reporting requirements whenever the Secretary believes its "cash transactions have a high degree of usefulness in criminal, tax, or other regulatory matters." 31 U.S.C. § 5312(a)(2)(Z).

But even if FinCEN's expansive interpretation were plausible (it's not), it would raise serious constitutional problems. Section 5318 is not a blank check authorization for FinCEN to require reporting requirements for any class of transactions that might yield investigatory leads for law enforcement. If it were, the BSA would violate the nondelegation doctrine because there would be no limit as to what kinds of transactions FinCEN could compel reporting on, or any governing policy speaking to when the Secretary should mandate reporting as to any class of transaction. *See supra* at 12–20. As such, this Court must reject FinCEN's interpretation because "[s]tatutes … should be read, if possible, to comport with the Constitution[.]"[14] *Consumers' Rsch. v. FCC*, Nos. 24-354 & 24-422, 2025, WL 1773630, at *16 (U.S. June 27, 2025) ("*Consumers*")

## II.    FinCEN's Interpretation Violates the Nondelegation Doctrine

The Constitution vests the legislative power to "regulate" interstate commerce exclusively with Congress. U.S. Const. art. 1, §§ 1, 8. "Accompanying that assignment of power to Congress is a bar on its further delegation: Legislative power … belongs to the legislative branch, and to no other." *Consumers*, 2025 WL 1773630, at *8 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)). As such, Article I requires that Congress must decide the "important subject[]" of whether and to what extent to

---

[14] Further, a narrowing construction is necessary to avoid serious constitutional doubt under the Commerce Clause and the Fourth Amendment. *See supra* at 20–30.

regulate American enterprise.[15] *Wayman v. Southard*, 23 U.S. (10 Wheat 1) 1, 20 (1825).

Applying this nondelegation doctrine, the Fifth Circuit holds that a statute violates the separation of powers if Congress either fails to: (1) "clearly delineate[] [its] general policy," or (2) "the boundaries of th[at] delegated authority." *Big Time Vapes, Inc. v. Food & Drug Admin.*, 963 F.3d 436, 443–44 (5th Cir. 2020) (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989); *accord Consumers*, 2025 WL 1773630, at *8. *See e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022) (finding a nondelegation violation because Congress provided "no guidance whatsoever" as to whether an agency should pursue enforcement actions in an Article III court or before an administrative law judge).

### A.   No Policy Speaking to When Business Should Report Lawful Transactions

To survive scrutiny, a statute must provide a "'general policy' that the agency must pursue." *Consumers*, 2025 WL 1773630, at *8. But this does not mean that any conceivable statutory purpose will suffice. For one, the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. This means that a more specific statement of policy is required for a more significant delegation. And when "setting … standards that [may] affect the entire national economy[,]" the Supreme Court has said Congress must "provide substantial guidance." *Id.* at 475.

---

[15] Congress can delegate only on matters of "less interest." *Id. Accord INS v. Chadha*, 462 U.S. 919, 952 (1983) (an action is "legislative" when it has "the purpose and effect of altering the legal rights, duties and relations of persons").

What is more, the "general policy" test must be applied in accordance with the Supreme Court's decisions in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *ALA Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ("*Schechter*")— because those cases "offer object lessons about the amount of latitude Congress can confer." *Consumers*, 2025 WL 1773630, at *13. It matters, therefore, that in both of those cases, the Supreme Court found open-ended delegations unconstitutional, notwithstanding the fact that Congress had pronounced a "[d]eclaration of [p]olicy" aimed at "rehabilitat[ing]" the national economy. *Schechter*, 295 U.S. at 534, 541–42. Congress was clear in stating its hortatory goals for the improvement of the economy and labor conditions generally. *Id.* at 534–45. Yet, that was insufficient because those hortatory goals did not speak to any policy governing whether or when the President should approve any proposed industry code of regulation, *id.*, or prohibit transport of hot oil. *Panama Refining*, 293 U.S. at 430 ("Congress ha[d] declared no policy, … established no standard, … laid down no rule.").

It is insufficient for the government to point to a supposed general statement of policy that leaves administrative discretion to do "anything that Congress may do within the limits of the commerce clause for the betterment of business[,]" or some other hyper-generalized goal. *Schechter*, 295 U.S. at 553 (Cardozo, J., concurring). Likewise, it is insufficient for the government to point to minimalist limitations that do not speak to the important subject of whether and to what extent the federal government should "regulate" commerce. *See Big Time Vapes*, 963 F.3d at 446, n.27 (acknowledging that the NIRA's "general policy statement" was insufficient because

14

it "'set[] up no standards' to guide the President's exercise of his authority outside of NIRA's 'general aims of rehabilitation … of the economy.'").

Here, FinCEN claims that the BSA authorizes the Secretary to compel systematic reporting of consumer transactions because 31 U.S.C. § 5318(g)(1) authorizes the Secretary to "require any financial institution … to report any suspicious transaction relevant to a possible violation of law or regulation." But under this expansive interpretation, Congress has completely ceded power to make the policy choice of whether to mandate collecting and reporting of information on any given class of transactions. First, what is "suspicious" is highly subjective.[16] And second, because we live in an age where all economic activity is subject to varying degrees of regulation (with both civil and penal consequences), information gleaned from *any transaction may have probative value* for authorities seeking to investigate "possible violation[s] of law or regulation." *See* A.B.A., *The Federalization of Criminal Law*, 11 Fed. Sent'g Rep. 194, 194 (Jan./Feb. 1999) (report finding a "dramatic increase in the number and variety of federal crimes"—including over forty percent growth in federal crimes between 1970–1999).

Further, under FinCEN's interpretation Section 5318 establishes no policy speaking to *when* the Secretary should exercise this authority. Even after the

---

[16] "[S]uspicious" means "tending to arouse suspicion." *See Suspicious,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/suspicious (last visited July 15, 2025). In turn, "suspicion" means "the act or an instance of suspecting something wrong without proof or on slight evidence." *Suspicion*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/suspicion (last visited July 15, 2025).

Secretary decides that certain transactions may be "suspicious" and that dragnet reporting may yield information about "possible" violations of law or regulation, the statute leaves the Secretary with discretion to decide for himself whether the informational benefits to government warrant the burdens to be imposed on industry. The Secretary is free to decide whether to impose reporting requirements, just as the National Industrial Recovery Act vested ungoverned discretion for President Roosevelt to decide whether to prohibit transport of hot oil in *Panama Refin.*, 293 U.S. at 430 (striking down Section 9(c) of the NIRA because it delegated total discretion for the President to do as he "deem[ed] fit"). And, in fact, the Secretary has exercised this discretion when *declining* to impose reporting requirements in the past. *See* Proposed Rule, 89 Fed. Reg. at 12424 ("[F]or many years, FinCEN has exempted [real estate transactions] from … regulation under the BSA....").

Likewise, under FinCEN's interpretation, Congress failed to establish any policy governing the Secretary's discretion to mandate reports under 31 U.S.C. § 5318(a)(2). FinCEN claims that provision authorizes regulation as the Secretary believes is warranted "to … guard against money laundering, the financing of terrorism, or other forms of illicit finance." Final Rule, 89 Fed. Reg. at 70259 n.11. But here as well, systematic reporting will invariably aid law enforcement in identifying potential cases of illicit finance. As such, the hortatory goal of helping law enforcement does not speak to any policy channeling the Secretary's discretion when deciding whether to mandate reporting as to any class of transactions.

16

Unlike other cases where Congress made a policy decision offering at least some fuzzy guidance, the BSA is utterly devoid of direction (under FinCEN's interpretation) on the "important subject matter" of when the Secretary should compel reports on consumer transactions. For example, in *Mayfield*, 117 F.4th at 614, the Fifth Circuit found that Congress had established a policy loosely governing the Department of Labor's authority to "define and delimit" the meaning of a Fair Labor Standards Act exemption because: (1) DOL was required to "define and delimit" the exemption for employees "employed in a bona fide executive, administrative or professional capacity" consistent with the objective meaning of those terms, and; (2) DOL had to exercise its discretion mindful of "the FLSA's statutory directive to eliminate substandard labor conditions …." *Id.* at 621. In combination those two guideposts provided requisite direction.[17] *Accord Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 682−84 (1980) (Rehnquist J., concurring) (emphasizing that the Supreme Court has never relied on general legislative purpose alone in upholding a statutory delegation). By contrast, under FinCEN's interpretation, the BSA offers only a nebulous goal of providing law enforcement with "highly useful" information—which could cover anything that the Eye of Sauron wishes to see.

In any event, more definite standards are required here because FinCEN's interpretation assumes authority to impose reporting requirements on any class of transactions. *See* 31 U.S.C. § 5312(a)(2)(Z) (authorizing the Secretary to extend its

---

[17] *Accord Big Time Vapes*, 963 F.3d at 444 (finding that, in combination, the Tobacco Control Act's express public health goals and "Congress's extensive-fact finding" made clear the policy guiding the agency's regulatory authority).

regulation to "any … business" if he believes its "cash transactions have a high degree of usefulness" to law enforcement). Because this would entail authority to impose rules affecting all American enterprise, the nondelegation doctrine requires a statement of policy offering at least as much direction as that found sufficient in *Whitman*, 531 U.S. at 462–63 (concerning the Environmental Protection Agency's authority to set environmental standards affecting industry throughout the nation). But here, the text is devoid of any direction—much less anything approaching EPA's charge, under the Clean Air Act, to use "the latest scientific knowledge" to set air quality standards "at a level that is requisite to protect public health from the adverse effects of [a specific] pollutant in the ambient air." *Id.* at 473.

Likewise, more definite direction is required to limit and channel administrative discretion in the specific context of this Rule, which intrudes into matters traditionally of local concern.[18] *Cf. Consumers*, 2025 WL 1773630, at *8 (emphasizing "the degree of agency discretion that is acceptable varies" by the context of the regulatory scheme). As such, the hortatory goal of providing law enforcement with greater information is insufficient.

---

[18] Also, more definite policy judgments and clearer limitations are required here because, under FinCEN's interpretation, the BSA's delegation abrogates Fourth Amendment rights—or, at the very least, raises sensitive policy concerns over the degree of privacy individuals should be allowed in a free society. *See United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring) (opining that nebulous delegations are problematic "when the regulation invokes criminal sanctions and potentially affects fundamental rights").

### B.    No Limit on the Secretary's Authority to Decide What Will (Or Will Not) Be Regulated

The BSA also violates the nondelegation doctrine—under FinCEN's interpretation—because Congress failed to impose meaningful boundaries. The Secretary is not confined to regulating any specific type of business; he can expand his power to cover all American enterprise if he chooses. The text empowers the Secretary to designate "any … business" as a "financial institution" if he believes its "cash transactions have a high degree of usefulness in criminal, tax, or regulatory matters." 31 USC § 5312(a)(2)(U), (Z). But this is no limitation because compelled reporting on any type of cash transaction could prove useful to law enforcement and regulatory authorities. *See infra* at 15–17. Law enforcement will always claim the information it covets will be highly useful to its investigatory purposes.

And under FinCEN's interpretation, the BSA is unlike other statutes where federal courts have found sufficiently demarcated boundaries. For example, unlike the Tobacco Control Act (TCA)—which limited FDA to regulating only "tobacco products" and those products similar in kind to those falling within that term's objective definition, *Big Time Vapes*, 963 F.3d at 445—the BSA apparently gives the Secretary sweeping power to "designate[]" any business as a "financial institution"— regardless of whether the business engages in activities "similar to, or related to" those of another designated financial institution. *Compare* 31 USC § 5312(a)(2)(Y) *with* § 5312(a)(2)(Z).

Moreover, in contrast to the TCA, where "Congress restricted the Secretary's discretion by making many of the key regulatory decisions itself[,]" *Big Time Vapes*,

19

963 F.3d at 445, the BSA leaves the Secretary unrestricted authority (under FinCEN's interpretation) to make all of the relevant regulatory decisions. Again, if FinCEN's authority is not limited to mandating reports on transactions for which there is an individualized basis for "suspicio[n]," 31 U.S.C. § 5318(g), nothing limits its discretion to compel "any … business," *Id.* § 5312(a)(2)(Z), to report all manner of transactions, in so far as the agency believes the benefits of reporting are worth the burdens to be imposed on any targeted industry.[19] *Cf.* Final Rule, 89 Fed. Reg. at 70260 (justifying the Rule because there are supposed "Benefits of Reporting"). And in the few instances where Congress ostensibly made regulatory decisions (as when Congress required financial institutions to maintain AML/CFT programs, *id.* § 5318(h)), the BSA expressly authorizes the Secretary to reject those policy choices. The Secretary is authorized to exempt any financial institution from statutory AML/CFT requirements—or any other "requirement" under Section 5318—simply upon declaring an exemption "appropriate." 31 U.S.C. § 5318(a)(7). In sum, Congress established no real limits to the Secretary's power to *either* expand his authority or to scale back the reach of the BSA under FinCEN's (flawed) interpretation.

### III.    The BSA and the Final Rule Exceed Congress's Enumerated Powers

The Constitution vests only the "legislative Powers herein granted" in Congress. U.S. Const. art. 1, § 1. And any legislative "powers not delegated" to

---

[19] In this case there was no way to decide whether the potential benefit of furnishing greater information to law enforcement warrants the burden of federal intrusion into an area of traditional local concern short of making a "policy choice[]" that "belong[s] to the people and their elected representatives" in a "functioning democracy." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (emphasizing that it is the role of lawmakers to weigh "incommensurable" values).

Congress are "reserved to the States respectively, or to the people." U.S. Const. amend. X. Here, the Defendants will likely argue that the BSA and the Final Rule are valid under Congress' power to "regulate [c]ommerce … among the several States." U.S. Const. art. 1, § 8, cl. 3. But that power cannot extend to compel the disclosure of the non-financed residential real estate transactions at issue here.

The Supreme Court has identified three categories of activity that may be regulated under the commerce power: (1) the channels of interstate commerce, (2) the instrumentalities (persons or things) in interstate commerce, and (3) activities that substantially affect interstate commerce. *See NFIB v. Sebelius*, 567 U.S. 519, 536 (2012). The reporting of real estate deals does not fall within any of these categories.

First, the Rule does not regulate the channels of interstate commerce. The Fifth Circuit defines the channels of interstate commerce as "the interstate transportation routes through which persons and goods move." *United States v. Bailey*, 115 F.3d 1222, 1226 (5th Cir. 1997) (internal citations omitted). But persons involved in real estate closings are, obviously, not transportation routes.

Second, the Rule does not regulate the instrumentalities of commerce, which are the "persons or things in interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558 (1995). Neither persons involved in real estate closings nor the real estate in question are transferred in interstate commerce.[20] Though such persons, like nearly every individual or business, *may* act in interstate commerce at times, the

---

[20] Plaintiffs do not contest that Congress can regulate the interstate wiring of funds. But that Rule does not regulate wire transfers. It does not, in fact, even regulate real estate transactions. It simply regulates (by mandating) disclosure. *See infra* at 5–6.

simple status of being involved in a real estate closing does not render those persons instrumentalities in interstate commerce.[21] *See Sebelius*, 567 U.S. at 557 ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions."). As a sister court in this District recently explained, "[c]ompanies, generally ... are not a 'channel' or 'instrumentality' of commerce. If they were, then Congress could regulate any company, in any way, all the time." *Texas Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 640 (E.D. Tex. 2024) (citations omitted); *see also United States v. Chavarria*, 140 F.4th 1257, 1264 (10th Cir. 2025) (observing that "not all people and things that have ever moved across state lines qualify as permissible targets of regulation" and "a critical limiting principle: an 'instrumentality *of interstate commerce*' must actually serve the 'end' of interstate commerce. 'Commerce' is the wellspring from which Congress's constitutional authority arises—not something's status as an instrumentality.") (cleaned up).

Third, the Final Rule does not regulate an activity that substantially affects interstate commerce. The Rule merely mandates reporting on lawful transactions. And courts in this district have already found that a similar reporting requirement could not be upheld under either the Commerce Clause or the Necessary and Proper Clause in *Texas Top Cop Shop*, 758 F. Supp. 3d at 660, and *Smith v. U.S. Department of Treasury*, 761 F. Supp. 3d 952, 963 (E.D. Tex. 2025).

---

[21] As to both its Commerce Clause and its Fourth Amendment claim, East Texas Title brings both a facial and an as-applied challenges.

A claim that the Rule should be upheld under the "substantial effects" test must be examined "carefully to avoid creating a general federal authority akin to the police power." *Sebelius*, 567 U.S. at 536. Courts consider: (1) the economic nature of the regulated activity, (2) the presence of a jurisdictional element limiting the statute's application to instances affecting interstate commerce, (3) Congressional findings about the effect of the regulated activity on interstate commerce and its necessity to a broader regulatory scheme, and (4) the attenuation of the link between the regulated activity and its effect on interstate commerce, if any. *See United States v. Morrison*, 529 US. 598, 610–12 (2000).[22] These considerations confirm that the Rule and the BSA exceed Congress's commerce power. And the history of state regulation of land transfers militates against extending the commerce power here.

**1. No Regulated Activity.** The BSA and the Rule are invalid under the first *Morrison* factor because the statute's target—persons involved in real estate closings—is not an activity at all.[23] Even accepting that real estate closings constitute

---

[22] The test is derived from Congress' power to make laws "necessary and proper for carrying into Execution" the other enumerated powers. *Gonzales v. Raich*, 545 U.S. 1, 5 (2005). Such regulation must be "indispensably requisite" to effectuate the commerce power. *McCulloch v. Maryland*, 17 U.S. 316, 367 (1819) ("To give [the term 'necessary'] a more lax sense, would be to alter the whole character of the government as a sovereignty of limited powers."). And it must not "undermine the structure of government established by the Constitution …." *Sebelius*, 567 U.S. at 559–60 (holding a mandate to purchase insurance could not be sustained as "proper" because then "Congress could reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it").

[23] The Supreme Court's decision in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 21 (1974), is inapposite. That decision did not address the BSA's reporting requirements; it merely upheld record retention requirements for banks. But those retention requirements were part and parcel with the BSA's substantive regulation of banking transactions. By contrast, the BSA's reporting requirements are

economic activity in a general sense, neither Section 5318 nor the Rule regulate that activity. The Rule merely requires *reporting* when that activity occurs.

Two recent cases are instructive. Both considered challenges to the Corporate Transparency Act (CTA), which requires companies to disclose stakeholder information related to their "beneficial owners" to FinCEN. The Sherman Division granted an injunction against the CTA and FinCEN's implementing rule after concluding they exceeded the commerce power. *Texas Top Cop Shop*, 758 F. Supp. 3d at 663. The Court found that the CTA did not regulate any activity; rather, it regulates "the anonymous existence and operation of corporations." *Id.* at 642–43 (observing that CTA "does not forbid a company from doing anything except insofar as it forbids a reporting company's failure to file … [a disclosure] report."). *Id.* Likewise, the Tyler Division issued a similar decision granting a preliminary injunction against the enforcement of the CTA. *Smith*, 761 F. Supp. 3d at 974.[24]

The same analysis applies here. While the transfer of real estate is no doubt an economic activity (albeit one that is traditionally regulated by the states), BSA sections 5318(a)(2) and (g)(1) do not regulate that activity. They require only the

---

untethered to federal regulation of any specific activity. And in any event, *Shultz* ultimately upheld the BSA's bank retention requirements under Congress' power to "condition … the spending of public funds." *Id.* at 50. The Court left unanswered the "questions [that] would arise had Congress relied solely upon its power over interstate commerce to impose the recordkeeping requirements." *Id.*

[24] The preliminary injunctions were stayed and then lifted and on March 21, 2025, after FinCEN issued an Interim Final Rule effectively eliminating the reporting requirements for entities formed in the United States. *Texas Top Cop Shop* remains pending at the Fifth Circuit. *Texas Top Cop Shop v. Bondi,* No. 24-40792 (5th Cir.).

reporting of activity by the persons involved.[25] Just like the CTA, the BSA is "a law enforcement tool—not an instrument calibrated to protect commerce; an exercise of police power, rather than a regulation of an activity which might impair commerce among the several states." *Texas Top Cop Shop*, 758 F. Supp. 3d at 643. And the commerce power cannot be extended to require mere disclosure of lawful activity because that would allow the federal government to demand reporting on all economic activity. "This the Commerce Clause will not tolerate." *Id.*

*Terkel v. Centers for Disease Control & Prevention* confirms that the test focuses narrowly on what precisely is regulated. 521 F. Supp. 3d 662, 671 (E.D. Tex. 2021). In that case, this Court held that CDC's nationwide eviction moratorium exceeded Congress' commerce power.[26] The opinion acknowledged the economic nature of the landlord tenant relationship; however, what mattered—for the purpose of the substantial effects test—was that the "expressly regulated activity" was the remedy of obtaining an eviction. *Id.* at 672 (quoting *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 634 (5th Cir. 2003)). So, even though real estate closings may be economic activity, what matters is that the *reporting* on those transactions is not.

**2. No Jurisdictional Element.** Likewise, the second *Morrison* factor cuts against extending federal power here. Section 5318(g) authorizes reporting

---

[25] By comparison, **other statutes** regulate the activities of money laundering, 18 U.S.C. § 1956, and the concealment of material facts concerning the ownership or control of assets involved in a transaction in interstate commerce. 31 U.S.C. § 5335.
[26] The decision was initially appealed. But the appeal was dismissed as moot without vacating the District Court's judgment. *Terkel v. Ctrs. for Disease Control & Prevention*, 15 F.4th 683, 685 (5th Cir. 2021).

requirements, but without a jurisdictional element limiting its reach to activities affecting interstate commerce. *See Morrison*, 529 U.S. at 613. Nor does Section 5318(a)(2) include a jurisdictional hook.[27] And, on its face, the Rule covers non-financed real estate transfers without exempting purely intrastate cash deals. *See* Flowers Decl. ¶ 8 (explaining that East Texas Title commonly facilitates non-financed real estate transfers between Texans using Texas financial institutions). And the "lack [of] any jurisdictional hook" is especially problematic given the "expansive" nature of the BSA's broad delegation. *Smith*, 761 F. Supp. 3d at 967.

**3. No Congressional Findings.** The third *Morrison* factor also cuts against any assertion of federal power because the BSA contains no findings that Section 5318's reporting requirements were essential to a broader economic regulatory scheme. In 1970, Congress found that "certain records maintained by businesses engaged in [various financial activities] have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings" and that "the power to require reports of changes in the ownership, control, and managements of types of financial institutions ... may be necessary for the same purpose." Act of Oct. 26, 1970, Pub. L. No. 91-508, § 121(a), 84 Stat. 1114, 1116 (1970). But such findings do not reflect a clear finding as to effects on interstate commerce of cash transactions in real estate because "malign actors may use almost any method to conceal their crimes." *Smith*,

---

[27] By contrast, Congress included express jurisdictional hooks when criminalizing money laundering, and the concealment of material facts in financial transactions. *See* 18 U.S.C. § 1956 (limiting jurisdiction to "transaction[s] which ... affect[] interstate or foreign commerce"); 31 U.S.C. § 5335 (same).

761 F. Supp. 3d at 968 (Concluding that the Constitution does not allow "Congress to regulate any individual, entity, or method merely because the regulation may make crime more difficult to conceal."). And perhaps more importantly, the amendment that added "persons involved in real estate closings and settlements" to the list of regulable financial institutions included no findings at all. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 6185, 102 Stat. 4181, 4354 (1988).

**4. Tenuous Connection.** The fourth *Morrison* factor confirms the Commerce Clause violation. Failure to report the details of a non-financed real estate deal does not affect interstate commerce—not even in the aggregate.[28] And even assuming the Rule regulates the general activity of non-financed real estate transactions, there would be only (at best) a hyper-attenuated link to any impact on interstate commerce.

Any supposed impact to the national economy must be germane to Congress' regulatory goals—otherwise the attenuation analysis would destroy "'the distinction between what is national and what is local in the activities of commerce.'" *Terkel*, 521 F. Supp. 3d at 674 (quoting *Lopez*, 514 U.S. at 567). But whatever effect intrastate non-financed real estate transactions might generally have on interstate commerce in the aggregate, there is no indication that this effect is relevant to the regulatory purpose of the BSA. And the Court may not "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce

---

[28] Money laundering may well have a more direct effect on interstate commerce. But the challenged provisions do not regulate money laundering; they mandate reporting. *See Terkel*, 521 F. Supp. 3d at 674 ("Because evictions are not themselves economic activity, their effects cannot be aggregated under the *Wickard* principle.").

Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567, *accord Nat'l League of Cities v. Usery,* 426 U.S. 833 (1976) ("Neither here nor in *Wickard* had the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities.").

**5. History of State Regulation.** This Court should resolve any ambiguity in the *Morrison* factors against expansion of Congress' commerce power because the Constitution's ratifiers understood property transfers to be beyond the federal government's power to regulate.[29] *See generally* Robert G. Natelson, *The Founders Interpret the Constitution: The Division of Federal and State Powers*, 19 Federalist Soc'y Rev. 60 (2018). The Final Rule regulates a subject that is "inherently local." *Terkel,* 521 F. Supp. 3d at 671–72 (emphasizing that "[r]esidential buildings do not move across state lines"). And there is no reason to countenance an expansion of federal power into this traditional domain of state regulation.

## IV.    The Final Rule Violates the Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. A "search" occurs when government physically intrudes upon an area enumerated in the Amendment, *United States v. Jones*, 565 U.S. 400, 411

---

[29] During the ratification debates John Marshall asked (rhetorically) whether the federal government could "make laws affecting the mode of transferring property ... between citizens of the same state?" Johnathan Elliot, 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 553 (2d ed. 1836). The answer was that it could not. *See also A Freeman II*, Pa. Gazette (Jan. 30, 1788), *in* 15 Documentary History, 510 (arguing that it could never "be cognizable" that the federal government could regulate real property).

(2012), or violates a "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 362 (1967) (Harlan, J., concurring).

The Final Rule's mandate effects a search. First, it physically intrudes on Plaintiff's papers. *See Hale v. Henkel,* 201 U.S. 43, 76–77 (1906) (business records considered "papers"). "Whether [government agents] rifle through the records in paper form, or view the records on a computer screen, they are doing so to obtain the information contained in the records." *Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013) (en banc), *aff'd City of Los Angeles v. Patel,* 576 U.S. 409 (2015). Here, FinCEN conscripts Plaintiff to rifle through its records to report information derived from its clients' papers.[30] Such compulsory legal process is a "constructive search." *Airbnb, Inc. v. City of New York,* 373 F. Supp. 3d 467, 482–83 (S.D.N.Y. 2019) ("[C]ompelled production from home-sharing platforms of user records ... implicates the Fourth Amendment.").

Second, the Rule implicates *Katz*'s "reasonable expectation of privacy" test, because it is "an invasion of the [business's] protected privacy interest in those papers, for essentially the same reasons." *Patel*, 738 F.3d at 1061. East Texas Title has an expectation of privacy in its own records based upon its "right to exclude others from prying into the contents of its records," *id.*, and that expectation is "reasonable" because ETT "do[es] not ordinarily disclose, and [is] not expected to disclose," the

---

[30] The Final Rule effects a trespass on both ETT's business records and its clients' papers in violation of the Fourth Amendment; the third-party doctrine is inapplicable here. *See, e.g., United States v. Smith*, 110 F.4th 817, 836 (5th Cir. 2024) (holding law enforcement conducted a search when it obtained Location History from Google; the third-party doctrine was inapplicable).

29

information that the Rule seeks. *Id.* at 1062. *See* Flowers Decl. ¶¶ 3, 5. This is particularly true of data regarding trusts or business entities formed among family members or close associates—data targeted by the Final Rule. 90 Fed. Reg. at 23991.

Because the reporting activities mandated by FinCEN's Final Rule constitute a search, the Fourth Amendment requires a warrant. *Smith*, 110 F.4th 817, 836 ("[T]he government must generally obtain a warrant supported by probable cause and particularity before requesting [protected] information."). But FinCEN promulgates the functional equivalent of the "reviled 'general warrants' ... which allowed ... an unrestrained search for evidence of criminal activity." *Riley v. California,* 573 U.S. 373, 403 (2014). The Rule seeks to collect, store—and presumably search at will— sensitive information contained in title companies' records, to reveal "*possible* violation[s] of law or regulation." 31 U.S.C. § 5318(g)(1) (emphasis added). *See* Final Rule, 89 Fed. Reg. at 70260 (explaining the benefits to law enforcement in developing investigative leads). This dragnet violates individuals' right to enjoy "that degree of privacy against the government that existed when the Fourth Amendment was adopted." *Kyllo v. United States*, 533 U.S. 27, 34 (2001). And no doctrine permits a warrantless search here. As such, the Rule must be set aside.[31]

## CONCLUSION

This court should grant summary judgment as to all of Plaintiff's claims.

---

[31] In *Shultz*, the Supreme Court upheld a requirement to report cash transactions over $10,000, but emphasized that mandated reporting must be appropriately "tailored ... to single out transactions found to have the greatest potential for ... circumvention [of law enforcement] and which involve substantial amounts of money." 416 U.S. at 63. There is no such tailoring here. *See, e.g.*, Final Rule, 89 Fed. Reg. 70269 (rejecting minimum dollar thresholds for reporting).

Respectfully submitted,

s/ *Luke A. Wake*
LUKE A. WAKE*
Cal. Bar No. 264647
JOSHUA P. THOMPSON
Cal. Bar No. 250955
AMY L. PEIKOFF*
Cal. Bar No. 220174
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
LWake@pacificlegal.org
JThompson@pacificlegal.org
APeikoff@pacificlegal.org

MOLLY E. NIXON*
N.Y. Bar No. 5023940
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
MNixon@pacificlegal.org

*Attorneys for Plaintiff*

***Pro hac vice***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2025, I filed the foregoing document with the Clerk of Court through the District Court's ECF system, which will send notice of this filing to all counsel of record.

s/ *Luke A. Wake*
LUKE A. WAKE*
*Counsel for Plaintiff*

***Pro hac vice***

32