**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| FLOWERS TITLE COMPANIES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 6:25-cv-127-JDK |
| | § | |
| SCOTT BESSENT, in his official | § | |
| capacity as U.S. Secretary of Treasury, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

This case challenges a 2024 Final Rule promulgated by the Financial Crimes Enforcement Network ("FinCEN"). The Rule implements reporting requirements for any non-financed residential real estate transaction where ownership is transferred to an entity or trust, subject to a few exceptions. Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 12,424 (February 16, 2024) (codified at 31 C.F.R. § 1031.320).

Plaintiff challenges the Rule as unlawful under the Administrative Procedure Act ("the APA"). Plaintiff first claims that the Rule exceeds FinCEN's statutory authority provided by the Bank Secrecy Act. If the Act authorizes the Rule, Plaintiff argues, then the Act violates the nondelegation doctrine, exceeds Congress's enumerated powers, and violates the Fourth Amendment.

The parties cross-moved for summary judgment. For the reasons set forth below, the Court grants Plaintiff's motion and denies FinCEN's cross-motion. Neither provision of the Act cited by FinCEN authorizes the Final Rule. The first

1

provision, 31 U.S.C. § 5319(g)(1), permits FinCEN to require reports of "any suspicious transaction." But the agency fails to explain or show how non-financed residential real estate transactions are categorically "suspicious." The second provision, 31 U.S.C. § 5318(a)(2), gives FinCEN the authority to require financial institutions to maintain "procedures" to comply with the Act, not the authority to require the reports covered by the Final Rule. The Court need not reach Plaintiff's alternative arguments.

Accordingly, the Court vacates and sets aside the Rule.

## I.

Congress enacted the Bank Secrecy Act in 1970 to combat money laundering primarily in international transactions. Since then, Congress has expanded the statute's reach to include certain "suspicious" domestic transactions. Based on this authority, FinCEN recently finalized a Rule that requires the reporting of any non-financed residential real estate transaction where ownership is transferred to an entity or trust.

**A.    The Statute.** The Bank Secrecy Act was enacted on October 26, 1970, to require banks to maintain records that "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." Pub. L. No. 91-508 § 101, 84 Stat. 1114–15 (1970) (codified as amended at 12 U.S.C. §§ 1829b, 1951–60; 31 U.S.C. §§ 5311 5311–14, 5316–36). The statute also authorized the Secretary of the Treasury to prescribe regulations to carry out the Act's purposes. 12 U.S.C. §§ 1829b(b)(1), 1952–53, 1958(b).

Congress has amended the Bank Secrecy Act on numerous occasions. *See, e.g.*, Housing and Community Development Act of 1992, Pub. L. 102-550 § 1517(b), 106 Stat. 3672, 4059–60 (1992) (amending the Act to authorize the Secretary to require financial institutions to report "any suspicious transaction relevant to a possible violation of law"); William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6002(2), 134 Stat. 3388, 4604 (2021) (amending the Act to "modernize" existing anti-money laundering laws "to adapt the government and private sector response to new and emerging threats").

The current version of the Bank Secrecy Act includes two provisions relevant here. First, § 5318(g)(1) authorizes the Secretary of Treasury to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). And § 5318(a)(2) authorizes the Secretary to

> require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance;

31 U.S.C. § 5318(a)(2).

The Secretary has delegated the authority "to take all necessary and appropriate actions to implement and administer the provisions of the Bank Secrecy Act" to the Director of FinCEN, a bureau within Treasury. Treasury Order 180-01, ¶ 3(a) (Jan. 14, 2020).

3

**B.      Geographic Targeting Orders.**  In 2001, in response to the terrorist attacks on the World Trade Center, Congress enacted the Patriot Act, which amended key portions of the Bank Secrecy Act.  Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT ACT") Act of 2001, Pub. L. No. 107–56, 84 Stat. 1116 (2001).  One provision broadly authorized the Secretary of Treasury to require any financial institution "in a geographic area" to report information about "any transaction" when there are "reasonable grounds" for "concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the Bank Secrecy Act]." 31 U.S.C. § 5326(a).  By statute, these "geographic targeting orders" ("GTOs") expire after 180 days, unless renewed.  *Id*. § 5326(d).

Since 2016, FinCEN has acted under this authority to issue GTOs that "require certain title insurance companies to file reports and maintain records concerning non-financed purchases of residential real estate above a specific price threshold by certain legal entities in select metropolitan areas of the United States."  89 Fed. Reg. at 70,259–60.  FinCEN found these GTOs to be "effective within the covered geographic areas."  *Id*. at 70,260.  But the GTOs were geographically limited, and thus "[did] not address the illicit finance risks posed by certain real estate transfers on a nationwide basis—a significant shortcoming," according to FinCEN.  *Id*.

**C.      The Rule.**  On February 16, 2024, FinCEN proposed establishing a nationwide reporting requirement for the vast majority of non-financed real estate transactions.  Anti-Money Laundering Regulations for Residential Real Estate

4

Transfers, 89 Fed. Reg. 12,424, 12,425 (February 16, 2024).  FinCEN received more than 620 comments, including comments questioning the statutory authority for the Rule, 89 Fed. Reg. at 70,261, and at least one comment predicting significant reporting costs and requesting FinCEN to narrow the Rule.  Fidelity Nat'l Fin., *Re: Anti-Money Laundering Regulations for Residential Real Estate Transfers*, (May 27, 2024), https://www.regulations.gov/comment/FINCEN-2024-0005-0623.  On August 29, 2024, FinCEN adopted the Rule with minimal changes.  89 Fed. Reg. at 70,258.

The Final Rule requires those involved in real estate transactions to report to FinCEN the details of any "non-financed transfer to a transferee entity or transferee trust of an ownership interest in residential real property."  *Id.* at 70,290.  The Rule exempts certain types of transactions like transfers "resulting from the death of an individual" or transfers "incident to divorce."  31 C.F.R. § 1031.320(b)(2).  Unlike the GTOs, which were limited by geography and price, the Rule requires the reporting of any eligible transaction occurring within the United States or its territories with no minimum dollar threshold value.  89 Fed Reg. at 70,269.  A full version of the Final Rule is appended to this Memorandum Opinion.

The Rule became effective on December 1, 2025.  *Id.* at 70,258.

**D.**    **This Lawsuit.**  On April 14, 2025, Plaintiff Flowers Title Companies, LLC filed this lawsuit, challenging the Final Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.[1]  First, Plaintiff claims that the Rule exceeds

---

[1] Others have also challenged the Final Rule.  *See Fidelity Nat'l Fin., Inc. v. Bessent*, No. 3:25-CV-554-WWB-SJH, (M.D. Fla. Feb. 19, 2026).  In *Fidelity*, the Magistrate Judge recommended denying the plaintiff's motion for summary judgment and granting FinCEN's cross-motion for summary judgment.  *Fidelity Nat'l*, 2025 WL 4477503 (Dec. 9, 2025).  The magistrate judge found that FinCEN

FinCEN's statutory authority under the Bank Secrecy Act.  Docket No. 11 ¶¶ 86–92. Alternatively, if the Act is interpreted as authorizing the Rule, Plaintiff alleges that the statute would grant such extensive powers that it would violate the "nondelegation doctrine," the Commerce Clause, and the Fourth Amendment.  *Id.* ¶¶ 93–122.

Both parties have filed motions for summary judgment.  Docket Nos. 12; 14. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

At oral argument, the parties agreed that if the Bank Secrecy Act does not permit the Final Rule, then the Court need not decide Plaintiff's other claims.

## II.

The Court begins (and ends) with Plaintiff's statutory argument—that the Final Rule exceeds FinCEN's statutory authority under the Bank Secrecy Act. Docket No. 12 at 9–12.

The APA requires courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C.

---

acted within its statutory authority and rejected the plaintiff's constitutional challenges to the Final Rule.  *Id.*  The district judge later adopted the recommendation.  *Fidelity Nat'l*, 2026 WL 472350 (Feb. 19, 2026).

§ 706(2)(C).  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  "Agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Inhance Techs., LLC v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 615 (E.D. Tex. 2021) ("[B]efore promulgating rules or regulations pursuant to a statute, agencies must demonstrate a clear 'textual commitment of authority' in the language Congress enacted." (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))).  And in reviewing whether an agency acted within its statutory authority, a court does not defer to the agency's interpretation but should decide for itself "whether the law means what the agency says." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

FinCEN cites two statutory provisions as authority for the Final Rule: (A) Section 5318(g)(1), which authorizes the agency to require financial institutions to report "any suspicion transaction relevant to a possible violation of law or regulation," 31 U.S.C. § 5318(g)(1), and (B) Section 5318(a)(2), which permits FinCEN to require financial institutions to "maintain appropriate procedures, including the collection and reporting of certain information," 31 U.S.C. § 5318(a)(2).

The Court considers each provision in turn.

## A.

Section 5318(g)(1) states:  "The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution,

7

to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 3518(g)(1). Plaintiff argues that this provision does not authorize the Final Rule because there is nothing "suspicious" about non-financed residential real estate transactions involving entities or trusts. Docket No. 12 at 10. FinCEN disagrees, arguing that "the Rule identifies, and explains why, non-financed transfers of residential real property to certain legal entities and trusts are a class of suspicious transactions." Docket No. 14 at 17.

All statutory interpretation "begins with the text." *E.g.*, *Ross v. Blake*, 578 U.S. 632, 638 (2016); *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[A] legislature says in a statute what it means and means in a statute what it says there."). Here, the key term is "suspicious," which is not defined in the statute. Applying the "fundamental canon of statutory construction," the Court interprets the term "as taking [its] ordinary meaning at the time Congress enacted the statute." *E.g.*, *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (citation modified); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–77 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."); *Loper Bright*, 603 U.S. at 400 ("[E]very statute's meaning is fixed at the time of enactment." (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018))). "[D]ictionaries are a principal source for ascertaining the ordinary meaning of statutory language." *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d

750, 755 n.22 (5th Cir. 2011) (quoting *United States v. Orellana*, 405 F.3d 360, 365 (5th Cir. 2005)).

Citing Merriam-Webster, both sides agree that "suspicious" means "tending to arouse suspicion" and that "suspicion" means "the act or an instance of suspecting something wrong without proof or on slight evidence."  Docket No. 12 at 15, Docket No. 14 at 19 (quoting *Suspicious*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/suspicious; *Suspicion*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/suspicion). *See also* OXFORD ENGLISH DICTIONARY (2nd ed. 1989) (defining "suspicious" as "open to, deserving of, or exciting suspicion"); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1917 (1987) (defining "suspicious" as "tending to cause or excite suspicion; questionable"); BLACK'S LAW DICTIONARY (6th ed. 1990) ("Suspicion implies a belief or opinion based upon facts or circumstances that do not amount to proof.").

Thus, to be "suspicious," a transaction must "tend to arouse" the belief that "something [is] wrong" based on facts or circumstances that do not amount to proof but may be based on "slight evidence."  The term as used in § 5318(g)(1), moreover, limits FinCEN's rule-making authority.  *See Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023) (holding that "the adjectives *necessary* and *appropriate*" in a statute granting rule-making authority "limit the authorization contained in this provision"); *see also Michigan v. EPA*, 576 U.S. 743, 752 (2015) (explaining that the term "appropriate and necessary" limited the agency's exercise of rule-making power).  This means that § 5318(g)(1) does not give FinCEN the

9

authority to regulate *all* transactions—but only those transactions that tend to arouse the belief that something is wrong.

FinCEN does not dispute any of this.  Instead, it claims that non-financed residential real estate transactions involving entities or trusts are categorically "suspicious."  89 Fed. Reg. at 70,258.  "[N]on-financed transfers do not involve [] financial institutions [subject to anti-money laundering laws]," FinCEN explains, and thus "such transfers can be and have been exploited by illicit actors of all varieties." *Id*. at 70,259.  As evidence, FinCEN cites "[n]umerous public law enforcement actions" where defendants were prosecuted for money laundering, presumably by conducting non-financed residential real estate transactions.  *See id*. at n.12 (citing cases).  FinCEN also states that, "from 2017 to early 2024, approximately 42 percent of non-financed real estate transfers captured by the Residential Real Estate GTOs were conducted by individuals or legal entities on which a SAR [Suspicious Activity Report] has been filed."  *Id*.  "In other words, individuals engaging in a type of transaction known to be used to further illicit financial activity—the non-financed purchase of residential real estate through a legal entity—are also engaging in other identified forms of suspicious activities." *Id*.

FinCEN's explanations are vague, conclusory, and unpersuasive.  The fact that some bad actors have conducted non-financed real estate transactions does not make such transactions categorically "suspicious."  If it did, then nearly every type of transaction imaginable would be "suspicious," and § 5318(g)(1) would grant FinCEN far-reaching powers no one has contemplated.  Nor does the 42% statistic justify the

Final Rule. This number focused on a limited subset of non-financed real estate transactions—those covered by the GTOs, which were limited by price and to geographic areas selected by FinCEN for monitoring. *See* 31 U.S.C. § 5326(a). Further, the fact that 42% of the parties involved in these transactions were flagged elsewhere as conducting other allegedly suspicious transactions does not prove much without more information. It could be that financial institutions were overinclusive in their reporting out of an abundance of caution or that the rules governing those reports required institutions to be overinclusive. Whatever the reason, the 42%-GTO statistic does not show that non-financed real estate transactions across the country are categorically suspicious.

FinCEN argues that it is not required to make an individualized assessment for every non-financed residential real estate transaction involving an entity or trust, that "suspicious" does not mean "unlawful," and that the Rule may properly "sweep[] in legitimate transactions." Docket No. 14 at 17–20. The Court agrees. But FinCEN is required to limit its reporting rule to "any suspicious transaction," 31 U.S.C. § 5318(g)(1), and it has not done so. Instead, FinCEN has declared an entire category of residential real estate transactions to be "suspicious" with no proof or sufficient explanation why. As Plaintiff demonstrates, in contrast, individuals with sufficient assets choose to purchase property without financing for myriad legitimate reasons, such as "sav[ing] thousands of dollars in lending costs and interest payments." Docket No. 12, Ex. 1. And those engaged in non-financed real estate transfers "almost always pay[] for the property with money from a savings account at a bank or credit

11

union that is required to maintain an anti-money-laundering program." *Id.* Further, "there is nothing unusual about an investor creating a limited liability corporation, or another incorporated entity, to acquire and hold real estate" because it "minimizes legal risks and serves legitimate tax planning purposes." *Id.* FinCEN does not dispute these points.

By FinCEN's own calculation, the "number of reportable transfers [covered by the Final Rule] would be between approximately 800,000 and 850,000 annually," costing "between approximately $428.4 and $690.4 million (midpoint $559.4 million) in the first compliance year." 89 Fed. Reg. at 70,283–84. On this record, the Court concludes that § 5318(g)(1) does not authorize FinCEN to treat every one of these transactions as "suspicious."

**B.**

Although FinCEN relied on § 5318(g)(1) as authority for the Rule below, *see* 89 Fed. Reg. at 12,428 and n.45; 89 Fed. Reg. at 70,259 and n.9, FinCEN alternatively justifies the Rule here under 31 U.S.C. § 5318(a)(2).[2] It is a "bedrock principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758. The Court, however, need not decide whether FinCEN is barred from relying on § 5318(a)(2) now

---

[2] Both the Proposed Rule and Final Rule discussed FinCEN's claimed authority under § 5318(g)(1), including the agency's efforts to satisfy the "suspicious transaction" requirement of that provision. *See generally* 89 Fed. Reg. at 12,428–31; *see also* 89 Fed. Reg. at 70,262. Although the agency also cited § 5318(a)(2) in a footnote, *see* 89 Fed. Reg. at 12,429 n.47; 89 Fed. Reg. at 70,259 n.11, FinCEN provided no analysis or explanation of that provision justifying the Rule.

because, as explained below, the Court concludes that (a)(2) does not authorize the Final Rule.

> Section 5318(a)(2) states:
>
> The Secretary of the Treasury may . . . (2) require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures, including the collection and reporting of certain information as the Secretary of the Treasury may prescribe by regulation, to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering, the financing of terrorism, or other forms of illicit finance.

Plaintiff argues that this provision authorizes FinCEN to issue only "rules specifying procedures that financial institutions must abide by when reporting information as mandated by rules separately authorized under the subchapter." Docket No. 12 at 10–11. FinCEN disagrees, arguing that § 5318(a)(2) independently "empowers FinCEN to require reporting to ensure compliance with the Bank Secrecy Act." Docket No. 14 at 15–16, 20–21.

In determining the ordinary meaning of a statute, "(1) we begin with the statute's language; (2) we give undefined words their ordinary, contemporary, common meaning; (3) we read the statute's words in proper context and consider them based on the statute as a whole; and (4) we consider a statute's terms in the light of the statute's purposes." *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (quotations removed). "In determining the ordinary meaning of terms, dictionaries are often a principal source." *NPR Invs., LLC ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014); *see also Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–68 (2012) (consulting multiple dictionaries and finding similar traits to deduce the ordinary meaning). Further, "[i]nterpretation of

a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576, 584–85 (5th Cir. 2020).

The key language in § 5318(a)(2) is the phrase "to maintain appropriate procedures, including the collection and reporting of certain information."  31 U.S.C. § 5318(a)(2).  "Procedure" is generally the form or method of doing something. OXFORD ENGLISH DICTIONARY (3rd ed. 2025) (defining "procedure" as "the established or prescribed way of doing something"); BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "procedure" as "a specific method or course of action").  "Reporting," in contrast, is ordinarily not a "procedure," but is the substantive act of giving an account or making a record.  MERRIAM-WEBSTER.COM  DICTIONARY, https://www.merriam-webster.com/dictionary/report ("report" means "to make a written record or summary of"); *Report*, OXFORD ENGLISH DICTIONARY (3rd ed. 2025) ("To give an account of"); *Report*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2022) ("To make or present an official or formal account of"). Interpreting another provision of the Bank Secrecy Act, the Fifth Circuit noted this distinction between "the substantive obligation to file reports" and "the procedural obligation to file the appropriate reporting form."  *United States v. Bittner*, 19 F.4th 734, 745 (5th Cir. 2021), *rev'd on other grounds by Bittner v. United States*, 598 U.S. 85 (2023).

Thus, the natural way to read § 5318(a)(2) is that FinCEN may require institutions to maintain procedures, including maintaining collection and reporting procedures. This interpretation carries forward "procedures" to modify "reporting," which is how people commonly speak and write. Consider, for example, the sentence, "The shop serves ice cream, including chocolate and strawberry." Most people would interpret that to mean that the shop serves "ice cream, including chocolate [ice cream] and strawberry [ice cream]." "[C]ommon parlance matters in assessing the ordinary meaning of a statute." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 790 (2020) (Kavanaugh, J., dissenting) (citing *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 84 (2017) (using a conversation between friends to demonstrate ordinary meaning); *Wis. Cent. Ltd.*, 585 U.S. at 278 (2018) (similar)). This interpretation also makes the most sense in light of the language of (a)(2) and the other provisions in § 5318.

FinCEN interprets the phrase "including the . . . reporting" to grant it independent, standalone authority to require reports from financial institutions. But this interpretation has several problems. First, it changes the meaning of the phrase "maintain appropriate procedures" from a requirement to maintain certain methods or forms to a substantive obligation to report information. *Cf. Bittner*, 19 F.4th at 745. It also ignores other language in (a)(2). How does a financial institution "maintain" the substantive reporting of information? FinCEN's interpretation, moreover, smuggles expansive reporting authority into a provision that is focused on procedures. *See Biden v. Nebraska*, 600 U.S. 477, 517 (2023) (Barrett, J., concurring)

(noting that in interpreting a statute, courts should be "skeptical of mismatches between broad invocations of power by agencies and relatively narrow statutes that purport to delegate that power" (citation modified)); *see also Whitman*, 531 U.S. at 468 ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms of ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

FinCEN's read of § 5318(a)(2) would also render the reporting requirement in § 5318(g)(1) surplusage. If § 5318(a)(2) broadly authorizes FinCEN to impose reporting requirements on financial institutions, then the more limited reporting authority in § 5318(g)(1) would be unnecessary. Courts, however, are "bound by the canon that we ought not interpret any statutory provision in a manner that would render another provision superfluous." *BNSF Ry. Co. v. United States*, 775 F.3d 743, 754 (5th Cir. 2015); *see also, e.g., Corley v. United States*, 556 U.S. 303, 314 (2009) (The canon disfavoring surplusage is "one of the most basic interpretative canons" and mandates that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation modified)). Finally, relatedly, FinCEN's interpretation would allow the agency to circumvent the express congressional limit on its authority in § 5318(g)(1)— which restricts FinCEN to requiring reports only where there is a "suspicious transaction."

The Court thus concludes that § 5318(a)(2) does not authorize the Final Rule. *See Weaver v. Metro. Life Ins. Co.*, 939 F.3d 618, 626 (5th Cir. 2019) ("[J]udges must

be attentive not to words standing alone but to surrounding structure and other contextual clues that illuminate meaning."); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

## III.

Having determined that the Rule violates the APA, the Court considers the proper remedy. Plaintiff asks for vacatur of the Rule under 5 U.S.C. § 706(2). Docket No. 12 at 21.

"Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022). And vacatur under the APA is "not party-restricted." *Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Id.* (quoting *Harmon v. Thornburgh*, 978 F.2d 484, 495 n.21 (D.C. Cir. 1989)). As such, the Fifth Circuit has repeatedly rejected agency efforts to limit relief to the parties and has upheld universal vacatur as the appropriate remedy in APA cases. *See, e.g., id.*; *Career Colls. and Schs. of Tex.*, 98 F.4th at 255; *Tex. Med. Ass'n v. U.S. Dep't of Health and Hum. Servs.*, 110 F.4th 762, 779–80 (5th Cir. 2024).

Though vacatur is the "default rule," *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), courts may deviate based on two equitable interest factors:

17

"(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), *rev'd on other grounds*, 597 U.S. 785 (2022)).  Considering these factors here, the Court concludes that the appropriate remedy is vacatur.

First, the seriousness of the Rule's deficiencies means it is unlikely that FinCEN can justify its decision on remand because the Rule exceeds its authority under the Bank Secrecy Act.  *See supra* Section II.  Without an "explanation as to how [FinCEN] could correct the Final Rule's conflicts with the statute on remand," this factor weighs against FinCEN.  *Tex. Med. Ass'n*, 110 F.4th at 779 (citation modified).

Second, the Court finds that vacatur would not be unduly disruptive.  The Rule has only been in place since December 1, 2025.  By granting vacatur, "it would 'do nothing but re-establish the status quo absent the unlawful agency action.'" *Texas v. EPA*, 132 F.4th 808, 863 (5th Cir. 2025) (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)).

With no reason to depart from the default rule, the Court finds that vacatur of the Final Rule and remand is the proper remedy.

### IV.

In sum, the Court holds that (1) the Final Rule conflicts with the unambiguous terms of the Bank Secrecy Act and (2) vacatur and remand is the proper remedy.

Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment (Docket No. 12), **DENIES** FinCEN's cross-motion for summary judgment (Docket No. 14), and **ORDERS** that the Rule be vacated.

So **ORDERED** and **SIGNED** this **19th** day of **March, 2026.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

## APPENDIX

### 31 C.F.R. § 1031.320 Reports of residential real property transfers.

(a) **General.**  A reportable transfer as defined in paragraph (b) of this section shall be reported to FinCEN by the reporting person identified in paragraph (c) of this section. The report shall include the information described in paragraphs (d) through (i) of this section. The reporting person may reasonably rely on information collected from others under the conditions described in paragraph (j). The report required by this section shall be filed in the form and manner, and at the time, specified in paragraph (k) of this section. Records shall be retained as specified in paragraph (l) of this section. Reports required under this section and any other information that would reveal that a reportable transfer has been reported are not confidential as specified in paragraph (m) of this section. Terms not defined in this section are defined in 31 CFR 1010.100.

(b) **Reportable Transfer.**

   (1) Except as set forth in paragraph (b)(2) of this section, a reportable transfer is a non-financed transfer to a transferee entity or transferee trust of an ownership interest in residential real property. For the purposes of this section, residential real property means:

      (i) Real property located in the United States containing a structure designed principally for occupancy by one to four families;

     (ii) Land located in the United States on which the transferee intends to build a structure designed principally for occupancy by one to four families;

    (iii) A unit designed principally for occupancy by one to four families within a structure on land located in the United States; or

    (iv) Shares in a cooperative housing corporation for which the underlying property is located in the United States.

   (2) A reportable transfer does not include a:

      (i) Grant, transfer, or revocation of an easement;

     (ii) Transfer resulting from the death of an individual, whether pursuant to the terms of a decedent's will or the terms of a trust, the operation of law, or by contractual provision;

    (iii) Transfer incident to divorce or dissolution of a marriage or civil union;

    (iv) Transfer to a bankruptcy estate;

     (v) Transfer supervised by a court in the United States;

    (vi) Transfer for no consideration made by an individual, either alone or with the individual's spouse, to a trust of which that individual, that individual's spouse, or both of them, are the settlor(s) or grantor(s);

(vii)  Transfer to a qualified intermediary for purposes of 26 CFR 1.1031(k)-1; or

(viii)  Transfer for which there is no reporting person.

(c) **Determination of reporting person.**

(1) Except as set forth in paragraphs (c)(2), (3) and (4) of this section, the reporting person for a reportable transfer is the person engaged within the United States as a business in the provision of real estate closing and settlement services that is:

(i)  The person listed as the closing or settlement agent on the closing or settlement statement for the transfer;

(ii)  If no person described in paragraph (c)(1)(i) of this section is involved in the transfer, then the person that prepares the closing or settlement statement for the transfer;

(iii)  If no person described in paragraph (c)(1)(i) or (ii) of this section is involved in the transfer, then the person that files with the recordation office the deed or other instrument that transfers ownership of the residential real property;

(iv)  If no person described in paragraphs (c)(1)(i) through (iii) of this section is involved in the transfer, then the person that underwrites an owner's title insurance policy for the transferee with respect to the transferred residential real property, such as a title insurance company;

(v)  If no person described in paragraphs (c)(1)(i) through (iv) of this section is involved in the transfer, then the person that disburses in any form, including from an escrow account, trust account, or lawyers' trust account, the greatest amount of funds in connection with the residential real property transfer;

(vi)  If no person described in paragraphs (c)(1)(i) through (v) of this section is involved in the transfer, then the person that provides an evaluation of the status of the title; or

(vii)  If no person described in paragraphs (c)(1)(i) through (vi) of this section is involved in the transfer, then the person that prepares the deed or, if no deed is involved, any other legal instrument that transfers ownership of the residential real property, including, with respect to shares in a cooperative housing corporation, the person who prepares the stock certificate.

(2) **Employees, agents, and partners.**  If an employee, agent, or partner acting within the scope of such individual's employment, agency, or partnership would be the reporting person as determined in paragraph (c)(1) of this section, then the individual's employer, principal, or partnership is deemed to be the reporting person.

21

(3) **Financial institutions.**  A financial institution that has an obligation to maintain an anti-money laundering program under this chapter is not a reporting person for purposes of this section.

(4) **Designation agreement.**

   (i) The reporting person described in paragraph (c)(1) of this section may enter into an agreement with any other person described in paragraph (c)(1) of this section to designate such other person as the reporting person with respect to the reportable transfer. The person designated by such agreement shall be treated as the reporting person with respect to the transfer. If reporting persons decide to use designation agreements, a separate agreement is required for each reportable transfer.

   (ii) A designation agreement shall be in writing, and shall include:

   (A) The date of the agreement;

   (B) The name and address of the transferor;

   (C) The name and address of the transferee entity or transferee trust;

   (D) Information described in in paragraph (g) identifying transferred residential real property;

   (E) The name and address of the person designated through the agreement as the reporting person with respect to the transfer; and

   (F) The name and address of all other parties to the agreement.

(d) **Information concerning the reporting person.**  The reporting person shall report:

   (1) The full legal name of the reporting person;

   (2) The category of reporting person, as determined in paragraph (c) of this section; and

   (3) The street address that is the reporting person's principal place of business in the United States.

(e) **Information concerning the transferee** —

   (1) **Transferee entities.**  For each transferee entity involved in a reportable transfer, the reporting person shall report:

   (i) The following information for the transferee entity:

   (A) Full legal name;

   (B) Trade name or "doing business as" name, if any;

   (C) Complete current address consisting of:

   *(1)* The street address that is the transferee entity's principal place of business; and

   *(2)* If such principal place of business is not in the United States, the street address of the primary

22

location in the United States where the transferee entity conducts business, if any; and

(D) Unique identifying number, if any, consisting of:

(1) The Internal Revenue Service Taxpayer Identification Number (IRS TIN) of the transferee entity;

(2) If the transferee entity has not been issued an IRS TIN, a tax identification number for the transferee entity that was issued by a foreign jurisdiction and the name of such jurisdiction; or

(3) If the transferee entity has not been issued an IRS TIN or a foreign tax identification number, an entity registration number issued by a foreign jurisdiction and the name of such jurisdiction;

(ii) The following information for each beneficial owner of the transferee entity:

(A) Full legal name;

(B) Date of birth;

(C) Complete current residential street address;

(D) Citizenship; and

(E) Unique identifying number consisting of:

(1) An IRS TIN; or

(2) Where an IRS TIN has not been issued:

(i) A tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

(ii) The unique identifying number and the issuing jurisdiction from a non-expired passport issued by a foreign government; and

(iii) The following information for each signing individual, if any:

(A) Full legal name;

(B) Date of birth;

(C) Complete current residential street address;

(D) Unique identifying number consisting of:

(1) An IRS TIN; or

(2) Where an IRS TIN has not been issued:

(i) A tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

(ii) The unique identifying number and the issuing jurisdiction from a non-expired passport issued by a foreign government to the individual;

23

(E) Description of the capacity in which the individual is authorized to act as the signing individual; and

(F) If the signing individual is acting in that capacity as an employee, agent, or partner, the name of the individual's employer, principal, or partnership.

(2) **Transferee trusts.** For each transferee trust in a reportable transfer, the reporting person shall report:

  (i) The following information for the transferee trust:

    (A) Full legal name, such as the full title of the agreement establishing the transferee trust;

    (B) Date the trust instrument was executed;

    (C) Unique identifying number, if any, consisting of:

      *(1)* IRS TIN; or

      *(2)* Where an IRS TIN has not been issued, a tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; and

    (D) Whether the transferee trust is revocable;

  (ii) The following information for each trustee that is a legal entity:

    (A) Full legal name;

    (B) Trade name or "doing business as" name, if any;

    (C) Complete current address consisting of:

      *(1)* The street address that is the trustee's principal place of business; and

      *(2)* If such principal place of business is not in the United States, the street address of the primary location in the United States where the trustee conducts business, if any; and

    (D) Unique identifying number, if any, consisting of:

      *(1)* The IRS TIN of the trustee;

      *(2)* In the case that a trustee has not been issued an IRS TIN, a tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

      *(3)* In the case that a trustee has not been issued an IRS TIN or a foreign tax identification number, an entity registration number issued by a foreign jurisdiction and the name of such jurisdiction;

    (E) For purposes of this section, an individual trustee of the transferee trust is considered to be a beneficial owner of the trust. As such, information on individual trustees must be reported in accordance with the requirements set forth in paragraph (e)(2)(iii) of this section;

      (iii)   The following information for each beneficial owner of the transferee trust:

          (A) Full legal name;

          (B) Date of birth;

          (C) Complete current residential street address;

          (D) Citizenship;

          (E) Unique identifying number consisting of:

              *(1)* An IRS TIN; or

              *(2)* Where an IRS TIN has not been issued:

                  *(i)* A tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

                  *(ii)* The unique identifying number and the issuing jurisdiction from a non-expired passport issued by a foreign government; and

          (F) The category of beneficial owner, as determined in paragraph (j)(1)(ii) of this section; and

      (iv)   The following information for each signing individual, if any:

          (A) Full legal name;

          (B) Date of birth;

          (C) Complete current residential street address;

          (D) Unique identifying number consisting of:

              *(1)* An IRS TIN; or

              *(2)* Where an IRS TIN has not been issued:

                  *(i)* A tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

                  *(ii)* The unique identifying number and the issuing jurisdiction from a non-expired passport issued by a foreign government to the individual;

          (E) Description of the capacity in which the individual is authorized to act as the signing individual; and

          (F) If the signing individual is acting in that capacity as an employee, agent, or partner, the name of the individual's employer, principal, or partnership.

(f) **Information concerning the transferor.**  For each transferor involved in a reportable transfer, the reporting person shall report:

    (1) The following information for a transferor who is an individual:

      (i)   Full legal name;

      (ii)   Date of birth;

      (iii)   Complete current residential street address; and

      (iv)   Unique identifying number consisting of:

(A) An IRS TIN; or

(B) Where an IRS TIN has not been issued:

(1) tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

(2) The unique identifying number and the issuing jurisdiction from a non-expired passport issued by a foreign government to the individual;

(2) The following information for a transferor that is a legal entity:

(i) Full legal name;

(ii) Trade name or "doing business as" name, if any;

(iii) Complete current address consisting of:

(A) The street address that is the legal entity's principal place of business; and

(B) If the principal place of business is not in the United States, the street address of the primary location in the United States where the legal entity conducts business, if any; and

(iv) Unique identifying number, if any, consisting of:

(A) An IRS TIN;

(B) In the case that the legal entity has not been issued an IRS TIN, a tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

(C) In the case that the legal entity has not been issued an IRS TIN or a foreign tax identification number, an entity registration number issued by a foreign jurisdiction and the name of such jurisdiction; and

(3) The following information for a transferor that is a trust:

(i) Full legal name, such as the full title of the agreement establishing the trust;

(ii) Date the trust instrument was executed;

(iii) Unique identifying number, if any, consisting of:

(A) IRS TIN; or

(B) Where an IRS TIN has not been issued, a tax identification number issued by a foreign jurisdiction and the name of such jurisdiction;

(iv) For each individual who is a trustee of the trust:

(A) Full legal name;

(B) Current residential street address; and

(C) Unique identifying number consisting of:

(1) An IRS TIN; or

(2) Where an IRS TIN has not been issued:

(i) A tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

26

        *(ii)* The unique identifying number and the issuing jurisdiction from a non-expired passport issued by a foreign government; and

(v) For each legal entity that is a trustee of the trust:

    (A) Full legal name;

    (B) Trade name or "doing business as" name, if any;

    (C) Complete current address consisting of:

        *(1)* The street address that is the legal entity's principal place of business; and

        *(2)* If the principal place of business is not in the United States, the street address of the primary location in the United States where the legal entity conducts business, if any; and

    (D) Unique identifying number, if any, consisting of:

        *(1)* An IRS TIN;

        *(2)* In the case that the legal entity has not been issued an IRS TIN, a tax identification number issued by a foreign jurisdiction and the name of such jurisdiction; or

        *(3)* In the case that the legal entity has not been issued an IRS TIN or a foreign tax identification number, an entity registration number issued by a foreign jurisdiction and the name of such jurisdiction.

(g) **Information concerning the residential real property.**  For each residential real property that is the subject of the reportable transfer, the reporting person shall report:

    (1) The street address, if any;

    (2) The legal description, such as the section, lot, and block; and

    (3) The date of closing.

(h) **Information concerning payments.**

    (1) The reporting person shall report the following information concerning each payment, other than a payment disbursed from an escrow or trust account held by a transferee entity or transferee trust, that is made by or on behalf of the transferee entity or transferee trust regarding a reportable transfer:

      (i)  The amount of the payment;

      (ii)  The method by which the payment was made;

      (iii)  If the payment was paid from an account held at a financial institution, the name of the financial institution and the account number; and

27

> (iv) The name of the payor on any wire, check, or other type of payment if the payor is not the transferee entity or transferee trust.
>
> (2) The reporting person shall report the total consideration paid or to be paid by the transferee entity or transferee trust regarding the reportable transfer, as well as the total consideration paid by or to be paid by all transferees regarding the reportable transfer.

(i) **Information concerning hard money, private, and other similar loans.** The reporting person shall report whether the reportable transfer involved credit extended by a person that is not a financial institution with an obligation to maintain an anti-money laundering program and an obligation to report suspicious transactions under this chapter.

(j) **Reasonable reliance** —

> (1) **General.** Except as described in paragraph (j)(2) of this section, the reporting person may rely upon information provided by other persons, absent knowledge of facts that would reasonably call into question the reliability of the information provided to the reporting person.
>
> (2) **Certification when reporting beneficial ownership information.** For purposes of reporting information described in paragraphs (e)(1)(ii) and (e)(2)(iii) of this section, the reporting person may rely upon information provided by the transferee or a person representing the transferee in the reportable transfer, absent knowledge of facts that would reasonably call into question the reliability of the information provided to the reporting person, if the person providing the information certifies the accuracy of the information in writing to the best of the person's knowledge.

(k) **Filing procedures** —

> (1) **What to file.** A reportable transfer shall be reported by completing a Real Estate Report.
>
> (2) **Where to file.** The Real Estate Report shall be filed electronically with FinCEN, as indicated in the instructions to the report.
>
> (3) **When to file.** A reporting person is required to file a Real Estate Report by the later of either:
>
> > (i) the final day of the month following the month in which the date of closing occurred; or
> >
> > (ii) 30 calendar days after the date of closing.

(l) **Retention of records.** A reporting person shall maintain a copy of any certification described in paragraph (j)(2) of this section. In addition, all parties to a designation agreement described in paragraph (c)(4) of this section shall maintain a copy of such designation agreement.

(m) **Exemptions** —

> (1) **Confidentiality.** Reporting persons, and any director, officer, employee, or agent of such persons, and Federal, State, local, or

28

Tribal government authorities, are exempt from the confidentiality provision in 31 U.S.C. 5318(g)(2) that prohibits the disclosure to any person involved in a suspicious transaction that the transaction has been reported or any information that otherwise would reveal that the transaction has been reported.

(2) **Anti-money laundering program.** A reporting person under this section is exempt from the requirement to establish an anti-money laundering program, in accordance with 31 CFR 1010.205(b)(1)(v).

(n) **Definitions.** For purposes of this section, the following terms have the following meanings.

(1) **Beneficial owner** —

(i) **Beneficial owners of transferee entities.**

(A) The beneficial owners of a transferee entity are the individuals who would be the beneficial owners of the transferee entity on the date of closing if the transferee entity were a reporting company under 31 CFR 1010.380(d) on the date of closing.

(B) The beneficial owners of a transferee entity that is established as a non-profit corporation or similar entity, regardless of jurisdiction of formation, are limited to individuals who exercise substantial control over the entity, as defined in 31 CFR 1010.380(d)(1) on the date of closing.

(ii) **Beneficial owners of transferee trusts.** The beneficial owners of a transferee trust are the individuals who fall into one or more of the following categories on the date of closing:

(A) A trustee of the transferee trust.

(B) An individual other than a trustee with the authority to dispose of transferee trust assets.

(C) A beneficiary who is the sole permissible recipient of income and principal from the transferee trust or who has the right to demand a distribution of, or withdraw, substantially all of the assets from the transferee trust.

(D) A grantor or settlor who has the right to revoke the transferee trust or otherwise withdraw the assets of the transferee trust.

(E) A beneficial owner of any legal entity that holds at least one of the positions in the transferee trust described in paragraphs (n)(1)(ii)(A) through (D) of this section, except when the legal entity meets the criteria set forth in paragraphs (n)(10)(ii)(A) through (P) of this section. Beneficial ownership of any such legal entity is determined under 31 CFR 1010.380(d), utilizing the criteria for beneficial owners of a reporting company.

29

(F) A beneficial owner of any trust that holds at least one of the positions in the transferee trust described in paragraphs (n)(1)(ii)(A) through (D) of this section, except when the trust meets the criteria set forth in paragraphs (n)(11)(ii)(A) through (D). Beneficial ownership of any such trust is determined under this paragraph (n)(1)(ii), utilizing the criteria for beneficial owners of a transferee trust.

(2) **Closing or settlement agent.** The term "closing or settlement agent" means any person, whether or not acting as an agent for a title agent or company, a licensed attorney, real estate broker, or real estate salesperson, who for another and with or without a commission, fee, or other valuable consideration and with or without the intention or expectation of receiving a commission, fee, or other valuable consideration, directly or indirectly, provides closing or settlement services incident to the transfer of residential real property.

(3) **Closing or settlement statement.** The term "closing or settlement statement" means the statement of receipts and disbursements prepared for the transferee for a transfer of residential real property.

(4) **Date of closing.** The term "date of closing" means the date on which the transferee entity or transferee trust receives an ownership interest in residential real property.

(5) **Non-financed transfer.** The term "non-financed transfer" means a transfer that does not involve an extension of credit to all transferees that is:
  (i) Secured by the transferred residential real property; and
  (ii) Extended by a financial institution that has both an obligation to maintain an anti-money laundering program and an obligation to report suspicious transactions under this chapter.

(6) **Ownership interest.** The term "ownership interest" means the rights held in residential real property that are demonstrated:
  (i) Through a deed, for a reportable transfer described in paragraph (b)(1)(i), (ii), or (iii) of this section; or
  (ii) Through stock, shares, membership, certificate, or other contractual agreement evidencing ownership, for a reportable transfer described in paragraph (b)(1)(iv) of this section.

(7) **Recordation office.** The term "recordation office" means any State, local, Territory and Insular Possession, or Tribal office for the recording of reportable transfers as a matter of public record.

(8) **Signing individual.** The term "signing individual" means each individual who signed documents on behalf of the transferee as part of the reportable transfer. However, it does not include any

30

individual who signed documents as part of their employment with a financial institution that has both an obligation to maintain an anti-money laundering program and an obligation to report suspicious transactions under this chapter.

(9) **Statutory trust.** The term "statutory trust" means any trust created or authorized under the Uniform Statutory Trust Entity Act or as enacted by a State. For the purposes of this subpart, statutory trusts are transferee entities.

(10)   **Transferee entity.**

   (i) Except as set forth in paragraph (n)(10)(ii) of this section, the term "transferee entity" means any person other than a transferee trust or an individual.

   (ii) A transferee entity does not include:

   (A) A securities reporting issuer defined in 31 CFR 1010.380(c)(2)(i);

   (B) A governmental authority defined in 31 CFR 1010.380(c)(2)(ii);

   (C) A bank defined in 31 CFR 1010.380(c)(2)(iii);

   (D) A credit union defined in 31 CFR 1010.380(c)(2)(iv);

   (E) A depository institution holding company defined in 31 CFR 1010.380(c)(2)(v);

   (F) A money service business defined in 31 CFR 1010.380(c)(2)(vi);

   (G) A broker or dealer in securities defined in 31 CFR 1010.380(c)(2)(vii);

   (H) A securities exchange or clearing agency defined in 31 CFR 1010.380(c)(2)(viii);

   (I) Any other Exchange Act registered entity defined in 31 CFR 1010.380(c)(2)(ix);

   (J) An insurance company defined in 31 CFR 1010.380(c)(2)(xii);

   (K) A State-licensed insurance producer defined in 31 CFR 1010.380(c)(2)(xiii);

   (L) A Commodity Exchange Act registered entity defined in 31 CFR 1010.380(c)(2)(xiv);

   (M) A public utility defined in 31 CFR 1010.380(c)(2)(xvi);

   (N) A financial market utility defined in 31 CFR 1010.380(c)(2)(xvii);

   (O) An investment company as defined in section 3(a) of the Investment Company Act of 1940 (15 U.S.C. 80a-3(a)) that is registered with the Securities and Exchange Commission under section 8 of the Investment Company Act (15 U.S.C. 80a-8); and

31

(P) Any legal entity controlled or wholly owned, directly or indirectly, by an entity described in paragraphs (n)(10)(ii)(A) through (O) of this section.

(11)    **Transferee trust.**

    (i)  Except as set forth in paragraph (n)(11)(ii) of this section, the term "transferee trust" means any legal arrangement created when a person (generally known as a grantor or settlor) places assets under the control of a trustee for the benefit of one or more persons (each generally known as a beneficiary) or for a specified purpose, as well as any legal arrangement similar in structure or function to the above, whether formed under the laws of the United States or a foreign jurisdiction. A trust is deemed to be a transferee trust regardless of whether residential real property is titled in the name of the trust itself or in the name of the trustee in the trustee's capacity as the trustee of the trust.

    (ii)  A transferee trust does not include:

        (A) A trust that is a securities reporting issuer defined in 31 CFR 1010.380(c)(2)(i);

        (B) A trust in which the trustee is a securities reporting issuer defined in 31 CFR 1010.380(c)(2)(i);

        (C) A statutory trust; or

        (D) An entity wholly owned by a trust described in paragraphs (n)(11)(ii)(A) through (C) of this section.